UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**RUTH ANN KRAUSHAAR**,                    Case Number 1:11 CV 2252

    Plaintiff,                                  Judge James S. Gwin

    v.                                          REPORT AND RECOMMENDATION

**COMMISSIONER OF SOCIAL SECURITY**,

    Defendant.                                  Magistrate Judge James R. Knepp II

### Introduction

Plaintiff Ruth Ann Kraushaar filed a Complaint (Doc. 1) against the Commissioner of Social Security seeking judicial review of the Commissioner's decision to deny disability insurance benefits (DIB) and supplemental security income (SSI). The district court has jurisdiction under 42 U.S.C. § 405(g) and § 1383(c)(3).

This matter has been referred to the undersigned for a Report and Recommendation pursuant to Local Rule 72.2(b)(1). For the reasons stated below, the undersigned recommends the Commissioner's decision be affirmed.

### Procedural Background

Plaintiff filed an application for DIB and SSI, alleging disability since January 1, 2007.  (Tr. 161, 164).  Plaintiff alleges she is disabled due to chronic obstructive pulmonary disease (COPD), asthma, bipolar disorder, and arthritis. (Tr. 218). Plaintiff's claims were denied initially (Tr. 84) and upon reconsideration (Tr. 95). Plaintiff requested a hearing in front of an administrative law judge (ALJ). (Tr. 109). After a hearing, where Plaintiff, her attorney, and a vocational expert appeared, the ALJ denied Plaintiff's claims.  (Tr. 56–73).  The ALJ found Plaintiff did not have an impairment or

combination of impairments, without substance use, that meets or medically equals a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1, specifically listings 3.02 and 3.03 relating to COPD and asthma, respectively. (Tr. 14). The Appeals Council denied Plaintiff's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1); 20 C.F.R. §§ 404.955, 404.981; 416.1455, 416.1481. On October 21, 2011, Plaintiff filed the instant case. (Doc. 1).

**Factual Background**

*Medical History*

Plaintiff's medical history of COPD, asthma, and substance use is epic; however, a pervasive theme remains: Plaintiff was non-compliant in taking prescribed breathing medication and refused to follow substance use treatment plans despite years of counseling and treatment options. Throughout Plaintiff's medical history, Plaintiff smoked between one to two packs of cigarettes a day, abused alcohol daily, and was frequently non-compliant with her breathing medications. (Tr. 267, 270, 271, 275, 277, 290, 296, 316, 329, 359, 342, 384, 386, 510, 515, 522, 560, 596, 580, 618, 685, 701, 714, 849, 852, 866, 870, 872, 952, 972-73, 982, 988, 1031, 1136, 1085).

On April 9, 2007, Plaintiff presented to Metro with difficulty breathing and reported she was not taking her breathing medication. (Tr. 358). Plaintiff took a pulmonary test and received a FEV1 score of 1.09, which was 39 percent of the predicted normal value. (Tr. 358). Pulmonary specialist Ms. Majewski, CNPC, assessed Plaintiff's condition as "COPD with acute exacerbation [due to] lack of med[ication] and continual smoking". (Tr. 359). It was noted Plaintiff smoked half a pack of cigarettes daily and she was not taking her breathing medication. (Tr. 358).

On August 22, 2007, Plaintiff presented to Metro for pulmonary testing. (Tr. 340). The "study

was technically adequate and the patient's effort [was] satisfactory." (Tr. 340). Plaintiff's FEV1 score measured at 1.80, which was 65 percent of the predicted normal value. (Tr. 340). Dr. Palwai noted improvement in Plaintiff's condition. (Tr. 340). Plaintiff's testing was reviewed by Ms. Majewski, who counseled Plaintiff on the importance of smoking cessation related to her condition. (Tr. 342).

On October 17, 2007, Plaintiff presented at Metro Neurosurgery Department for upper neck and back pain resulting from a bicycle accident, which occurred the year before. (Tr. 329). Plaintiff stated she drank alcohol to control the pain "until she passe[d] out at least [two] times per week." (Tr. 329). Plaintiff reported smoking one to two packs of cigarettes per day. (Tr. 329). During examination, Plaintiff's respirations were "easy and regular." (Tr. 332).

On June 19, 2008, Plaintiff presented to Southwest General Health Center emergency room for shortness of breath due to cut grass exposure. (Tr. 384-85). Plaintiff was immediately put on "alcohol withdrawal protocol" and given a Habritrol patch for nicotine withdrawal. (Tr. 384). Plaintiff's chest x-rays did not reveal lung obstruction, her condition "clinically improved", and she was discharged June 22, 2008 with breathing medication. (Tr. 384). Upon discharge, Dr. Paul "discussed with the [Plaintiff] at length to refrain from smoking" and drinking alcohol. (Tr. 386). He noted Plaintiff's breathing condition was caused by an acute exacerbation from cut grass exposure. (Tr. 386).

On July 30, 2008, Plaintiff presented to Metro for pulmonary testing. (Tr. 326). Plaintiff's FEV1 score measured at 1.37. However, the study was "sub-optimal due to lack of plateau in the volume-time tracing", which could overestimate the FEV1/FEV ratio. (Tr. 325). Dr. Venkateshaiah noted Plaintiff suffered from "[m]oderately severe obstructive ventilatory impairment" and Plaintiff's FEV1 score was significantly worse than Plaintiff's last test. Plaintiff reported smoking one pack of

3

cigarettes per day. (Tr. 325).

On August 14, 2008, Plaintiff presented at Metro for a routine asthma and COPD check-up with Ms. Majewski, CNPC. (Tr. 313).  Ms. Majewski counseled Plaintiff about the benefits of smoking cessation related to her breathing condition, adjusted Plaintiff's breathing medications, and noted Plaintiff suffered from "[s]evere obstructive lung disease with COPD". (Tr. 314). Plaintiff performed a lung function test.  Plaintiff's FEV1 score measured 1.63, which was 55 percent of the predicted normal value. (Tr. 314, 316). Plaintiff smoked a cigarette 15 minutes prior to testing. (Tr. 316).

On November 11, 2008, Plaintiff presented to Dr. Mark Krofina, her primary care physician, for a follow-up visit. Dr. Krofina noted Plaintiff suffered from bipolar disorder and refilled a prescription for Prozac. (Tr. 288).

On November 23, 2008, Plaintiff presented at Metro Pulmonary Clinic for a COPD follow-up visit with Ms. Majewski. (Tr. 290). Plaintiff reported completing an eight-week smoking cessation class, but acknowledged smoking about seven cigarettes per day. (Tr. 290). Ms. Majewski noted Plaintiff had "good breath sounds", her COPD and asthma were "controlled", and she recommended Plaintiff continue using Symbicort and Spiriva. (Tr. 291).

On January 15, 2009, Plaintiff presented to Metro emergency room and reported severe breathing problems with tightness in her chest as a result of cleaning out her daughter's basement, which was "full of dust". (Tr. 272). Plaintiff also reported smoking one pack of cigarettes per day for the past 25 years and drinking approximately "6 beers and 2 large glasses of vodka" daily. (Tr. 275, 277). X-rays showed Plaintiff's lungs were "clear" with "[n]o acute cardiopulmonary process." (Tr. 361).  Upon discharge the following day, Plaintiff was diagnosed with COPD exacerbation and

alcohol withdrawal. Plaintiff was prescribed the following breathing medications: Prednisone, Albuterol, Symbicort, Risperdal, Provencil, Xylocaine, and Spiriva Handihaler. (Tr. 273, 285).

On January 30, 2009, Plaintiff presented at Metro for a follow-up visit after hospitalization for COPD. (Tr. 270). Dr. Krofina noted Plaintiff's COPD, stating it "[w]ould be nice if she would quit smoking". (Tr. 270). Dr. Krofina acknowledged Plaintiff is allergic to cats but, nevertheless, has a cat. (Tr. 270). Dr. Krofina diagnosed Plaintiff with COPD and nicotine abuse. (Tr. 271).

On February 19, 2009, Plaintiff presented at Metro for a "follow-up asthma visit". (Tr. 267). Plaintiff reported she smoked one pack of cigarettes and drank approximately three 16 ounce beers daily. (Tr. 267). Ms. Majewski, CNP, noted spending a significant amount of time discussing smoking cessation with the Plaintiff and the impact it would have on her breathing problems if she quit. (Tr. 269).

On March 20, 2009, Plaintiff presented at Metro for pulmonary function testing. (Tr. 524). Plaintiff's FEV1 measured at 1.6, which was 58 percent of the predicted normal value. (Tr. 524). Dr. Infield noted the test demonstrated "acutely improved but slowly deteriorating" airway obstruction. (Tr. 698). Plaintiff was counseled about smoking cessation and was told to "keep [her] cat out of [the] bedroom." (Tr. 701).

On April 5, 2009, Plaintiff presented to Metro for psychiatric care and alcohol abuse. (Tr. 522). Margaret Blass, PNC, felt Plaintiff would benefit from a residential program for alcohol dependence. (Tr. 522). On April 24, 2009, Plaintiff again presented for psychiatric care and alcohol abuse, but stated she had mixed feelings about giving up alcohol. (Tr. 685, 687).

On May 26, 2009, Plaintiff presented to Metro for psychiatric care. (Tr. 513). Plaintiff reported drinking alcohol before coming in, was crying, and stated she was moving in with a person

she just met and planned to pay him back when she was awarded social security disability. (Tr. 514). Margaret Blass, PNC, asked Plaintiff to refrain from presenting at Metro after drinking and requested Plaintiff attend AA meetings. (Tr. 515).

On June 19, 2009, Plaintiff presented at Metro with breathing difficulty due to cut grass exposure and lack of breathing medication. (Tr. 510-11). Plaintiff underwent pulmonary function testing and received a FEV1 measurement of .98, which was 33 percent of the predicted normal value. (Tr. 508). Plaintiff reported smoking five to six cigarettes a day, but up until the week before had been smoking the usual pack and a half of cigarettes daily. (Tr. 510).

On July 13, 2009, Plaintiff presented at Metro for pulmonary testing. (Tr. 498). Plaintiff's FEV1 score measured 1.74. (Tr. 498). Dr. Nicolacakis noted a 77 percent improvement since Plaintiff's last examination on June 19, 2009. (Tr. 496). It was specifically noted Plaintiff recently quit drinking and smoking at the end of June 2009, and maintained "good compliance" in "procuring medication", all of which directly correlated with better pulmonary status scores. (Tr. 500).

On July 15, 2009, Plaintiff presented for psychiatric care at Metro. (Tr. 491-92). Plaintiff reported she was sober and had family support. (Tr. 491-92). However, Plaintiff's short lived road to recovery ended on July 21, 2009, when Plaintiff was escorted by police to Metro emergency room for intoxication, making suicidal threats, and striking herself. (Tr. 480). Plaintiff's boyfriend called police because of Plaintiff repeated "violent outburts." (Tr. 480). Plaintiff reported drinking all day and getting into an argument with her boyfriend. (Tr. 485). Upon discharge, Plaintiff was ordered to follow-up with the psychiatric clinic. (Tr. 485). No respiratory issues were noted, despite Plaintiff's stressful and violent behavior.

On September 1, 2009, Plaintiff presented at Metro for a pulmonary follow-up. (Tr. 618).

6

Plaintiff's breathing medication was refilled and Plaintiff was counseled "to eliminate all cigarette smoking". (Tr. 618).

On September 9, 2009, Plaintiff presented to Metro for severe persistent asthma and COPD. (Tr. 453). Plaintiff reported she quit smoking and stated she felt "great" and "much better". (Tr. 453). While Plaintiff stated she still had a chronic cough, it was not as bad as when she was smoking. (Tr. 453).

On October 13, 2009, Plaintiff presented to Metro for psychiatric management. (Tr. 449). Plaintiff received refills on medication and reported attendance at pulmonary rehabilitation therapy. (Tr. 449). Plaintiff reported she quit smoking, was attending alcohol treatment meetings, and had been sober for approximately two months. (Tr. 449-50).

On October 21, 2009, Plaintiff presented to the Metro emergency room complaining of neck pain. (Tr. 440). X-rays of Plaintiff's spine revealed thiracolumbar syrinx extension at T5-T6. (Tr. 443-44). Dr. Brown noted Plaintiff's smoking and COPD and discussed with her "[t]he importance of quitting smoking for her lung health." (Tr. 443).

On November 2, 2009, Plaintiff presented to Metro for breathing difficulties. (Tr. 595). Plaintiff reported running out of medication, which exacerbated her symptoms, but Plaintiff admitted she smoked half a pack of cigarettes a day and drank daily, abruptly ending her two month sobriety and smoking cessation. (Tr. 596). Plaintiff's condition was "much improved" once given breathing medication and she stated she felt "comfortable". (Tr. 597, 1059).

On November 6, 2009, Plaintiff presented at Metro emergency room for shortness of breath and dyspnea. (Tr. 565). Plaintiff was diagnosed with COPD exacerbation and given breathing medication. (Tr. 571). Plaintiff reported smoking five to ten cigarettes a day. (Tr. 580). Plaintiff was

discharged November 8, 2009 with instructions to follow up with a pulmonary specialist. (Tr. 581).

On November 9, 2009, Plaintiff presented to Metro for pulmonary follow-up. (Tr. 584). Plaintiff's FEV1 score was 1.12, which was 38 percent of the predicted normal value. (Tr. 584, 1035). However, the "study [was] sub-optimal due to lack of plateau in the volume-time tracing". (Tr. 1029). Plaintiff acknowledged she smoked half a pack of cigarettes per day. (Tr. 1031). A chest x-ray revealed Plaintiff's lungs were clear. (Tr. 1033). Plaintiff's breathing medications were refilled and she was "advised she must quit smoking". (Tr. 1033).

On November 16, 2009, Plaintiff presented to Metro with complaints of pain, flu-like symptoms, and requested pulmonary assistance. (Tr. 561). Plaintiff reported she thought she had a seizure the night before and she "could hear people talking." (Tr. 1026). Plaintiff "had been drinking [and] taking vicodin and flexeril." (Tr. 1026). Plaintiff stated her legs gave out and she had no recollection after that. (Tr. 1026). Plaintiff indicated she experienced generalized pain. (Tr. 1026). Ms. Majewski assessed Plaintiff with "[severe] COPD" and "post influenza like illness" and advised Plaintiff to quit smoking. (Tr. 561). Plaintiff was advised not to use other people's medications for recreational use. (Tr. 1027). It was noted Plaintiff "walked out of clinic smiling [with a] steady gait and no evidence of pain." (Tr. 1027).

On November 23, 2009, Plaintiff presented to Metro with complaints of back pain. (Tr. 560). Plaintiff presented highly intoxicated with her three-year old granddaughter. (Tr. 560). Plaintiff began yelling and crying when questioned about her sobriety. (Tr. 560). Plaintiff admitted to drinking and taking vicodin. (Tr. 560). Plaintiff was escorted by security to emergency. (Tr. 560).

On December 8, 2009, Plaintiff presented at Metro for a follow-up stemming from her emergency room visit November 23, 2009. (Tr. 713). Plaintiff was resistant to discussing alcohol

8

treatment as she "[did] not have faith in any treatment program." (Tr. 714). Plaintiff acknowledged she drank before the appointment and had not been truthful about her alcohol dependance in recent history. (Tr. 714).

On January 3, 2010, Plaintiff presented at Metro emergency room with pain in her right chest, shortness of breath, and a broken right arm. (Tr. 925, 1000). It was noted Plaintiff was screaming in pain, despite shortness of breath, yet Plaintiff could "move around in bed and get her belongings off the floor." (Tr. 1002). Chest x-rays were taken, revealing no lung obstruction. (Tr. 925).

On January 4, 2010, Plaintiff presented at Metro for pain to a broken right arm she sustained December 26, 2009 during an altercation with her boyfriend's son and sister, and chest pain from an altercation with her boyfriend. (Tr. 994). Plaintiff was requesting pain medication, even though she had been prescribed 20 pain pills the day before. (Tr. 995). Ms. Lawrence, CNP, had a "[l]ong discussion with [Plaintiff]" and told Plaintiff she could not "not give her a [prescription] for a pain medication" she was just prescribed the day before. (Tr. 998). Further, Ms. Lawrence told the Plaintiff she "should still have this medication in her possession if she [was] taking it as [prescribed]". (Tr. 998).

On January 18, 2010, Plaintiff presented at Metro for a routine appointment in the pulmonary clinic. (Tr. 987). Plaintiff's pulmonary status was stable. (Tr. 988). Plaintiff reported she quit smoking; however, later she reported smoking 4 flavored cigars daily but "not inhaling." (Tr. 988). Plaintiff reported "good [medication] compliance" and no difficulties procuring medication. (Tr. 988). Plaintiff was alert, pleasant, and conversive. (Tr. 990).

On February 4, 2010, Plaintiff presented at Metro for a follow-up regarding a right arm fracture. (Tr. 985). Plaintiff presented with her cast off. (Tr. 985). Plaintiff stated "[she] had a dream

[she] could pull off the cast, so [she] pulled it off." (Tr. 985). When Plaintiff was questioned again about taking her cast off, she stated she "wanted to see if her dream would come true." (Tr. 985). She reported having significant pain about the right arm on presentment. (Tr. 985).

On February 15, 2010, Plaintiff presented at Metro for psychiatric care. (Tr. 982). Plaintiff reported she cut back on smoking to 12 cigarettes per day. (Tr. 982). Plaintiff also reported she was living with her mother after her boyfriend's son broke her arm trying to throw her out of the house. (Tr. 982). It was noted Plaintiff  "has not been historically honest about alcohol use." (Tr. 983).

On March 10, 2010, Plaintiff presented at Metro for psychiatric follow-up. (Tr. 972). Plaintiff brought a friend, Ed Hart, to the appointment. (Tr. 972). Mr. Hart chastised Ms. Blasse, PNCP, for focusing on Plaintiff's alcohol dependance instead of the proper prescription for mental health treatment. (Tr. 973). "He [thought] it [was] insulting that [Ms. Blasse] continue[d] to advocate alcohol treatment along with mental health treatment." (Tr. 973). Plaintiff stated she was "in agreement with Ed." (Tr. 973). Plaintiff requested a provider change unless Ms. Blasse stopped focusing on alcohol treatment. (Tr. 974).

On March 15, 2010, Plaintiff presented at Metro for psychiatric evaluation stemming from an injury sustained during a fight with her boyfriend. (Tr. 969). Plaintiff denied abusing alcohol and nicotine prior to the current visit, which her boyfriend attended, but Plaintiff's boyfriend reported Plaintiff drank at least "3-4 beers and was messed up daily", after which Plaintiff confirmed as true. (Tr. 969). Plaintiff acknowledged she still smoked, despite having COPD and asthma. (Tr. 969).

On April 7, 2010, Plaintiff presented at Metro emergency room for shortness of breath. (Tr. 918). Plaintiff reported her breathing condition was aggravated when her boyfriend "put his finger down her throat". (Tr. 918). Plaintiff reported smoking  half a pack of cigarettes per day and drinking

10

three to four beers daily. (Tr. 952). Plaintiff's behavior during treatment was disruptive and troublesome. Plaintiff removed her IV and "started licking IV insertion site", continually asked for beer and cigarettes, pounded on her door, and attempted to leave her room. (Tr. 953). Plaintiff swore at the hospital staff, made multiple verbal threats, attempted to kick and punch the hospital staff, refused to keep her gown on, "began throwing objects around the room", "tried [to stab] herself", and stated she wanted to harm others. (Tr. 954). Plaintiff was eventually placed in seclusion under the watch of Metro Police. (Tr. 954). Notably, Plaintiff was capable of partaking in these erratic and stressful behaviors in light of, and despite the fact that she presented for difficultly breathing. (Tr. 954). Dr. Schmidt noted there was "no evidence of resp[iratory] distress" during Plaintiff's visit. (Tr. 954).

On April 19, 2010, Plaintiff reported at Metro for a follow-up regarding injuries stemming from an assault by her boyfriend and his family. (Tr. 946). Plaintiff reported improvement since her last visit. (Tr. 946). Plaintiff was discharged with a "healed closed fracture of ulnar shaft". (Tr. 948).

On April 28, 2010, Plaintiff reported at Metro emergency room for shortness of breath. (Tr. 915). Plaintiff's COPD was aggravated due to a fire that began in her bedroom after she lit two candles and fell asleep. (Tr. 915, 936). Plaintiff was admitted for smoke/chemical inhalation and discharged in stable condition shortly after. (Tr. 916, 936). During a visit with psychiatric the same day, Plaintiff reported she "[was] doing well even though she did not have enough money to buy risperdal." (Tr. 944).

On May 21, 2010, Plaintiff reported at a psychiatric appointment she could not afford breathing medication and was having a hard time breathing. (Tr. 849).

On May 28, 2010, Plaintiff presented at Metro pulmonary clinic complaining of shortness of

11

breath. (Tr. 848). Plaintiff had a "very loud audible wheeze", was unable to talk, and was escorted to the emergency room. (Tr. 848). Plaintiff reported smoking a pack of cigarettes daily for 25 years and recently began smoking more than a pack a day since April 2010. (Tr. 852). Plaintiff reported being short of breath since her boyfriend strangled her in the beginning of April 2010. (Tr. 855). Plaintiff was diagnosed with severe COPD exacerbation upon discharge. (Tr. 861).

On June 2, 2010, Plaintiff presented at Metro for a follow-up with Dr. Krofina, following her emergency room visit. (Tr. 870). Plaintiff reported she was homeless and slept in her daughter's moldy basement. (Tr. 870). Plaintiff acknowledged she still smoked cigarettes and it was noted Plaintiff smelled like alcohol. (Tr. 870).

On June 4, 2010, Plaintiff presented at Metro for pulmonary function testing. (Tr. 864). During the visit, it was noted Plaintiff went to the emergency room "3-4 times a year for breathing" and at Plaintiff's last ER visit Plaintiff was placed on oxygen, but her condition improved significantly within 24 hours after breathing medication was administered. (Tr. 866). Plaintiff admitted to smoking marijuana and three to four cigarettes per day but stated her breathing "has somewhat improved in the past 2 days." (Tr. 866). Plaintiff's FEV1 measured at 1.23, which was 42 percent of the predicted normal value. (Tr. 868). A post-brochodilator was not performed. (Tr. 866). Plaintiff was diagnosed with COPD and asthma triggered by "recurrent exacerbations" due to "medication noncompliance". (Tr. 869). It was noted Plaintiff's medication noncompliance was a result of "financial and logistical barriers". (Tr. 869). Plaintiff was again counseled on the need to cease smoking in order to see improvement in her condition. (Tr. 869). Ms. Majewski carefully noted she "spent more than 30 minutes with the patient[,] of which greater than 50% of the time was spent in counseling and coordination of care." (Tr. 869)

12

On June 29, 2010, Plaintiff presented at Metro emergency for injuries related to an assault. (Tr. 872). Plaintiff reported she was nauseous and vomiting. (Tr. 872). Plaintiff was prescribed pain medication when she presented after the initial injury but came back to the ER because she could not afford her medication. (Tr. 872). Plaintiff reported smoking a pack of cigarettes a day, which recently increased. (Tr. 872). Plaintiff improved after receiving medication and was discharged. (Tr. 876).

On July 13, 2010, Plaintiff presented at Metro for pulmonary function testing. (Tr. 841). The test was noted as "adequate and the patient's effort [was] satisfactory." (Tr. 841). Plaintiff's FEV1 score was 1.63, which was 56 percent of the predicted normal value. (Tr. 846). A post-bronchodilator test was not performed. (Tr. 847). During a psychiatric appointment the previous day, Plaintiff reported she was not taking her breathing medication as she could not afford it. (Tr. 843). However, when she reported to pulmonary that same day, Plaintiff reported she was taking her breathing medication and said a "friend and her mom helping her get med[ication]". (Tr. 846). Plaintiff reported smoking at least 3 cigars daily to help "wean and stop all smoking." (Tr. 846).

On July 20, 2010, Plaintiff presented at Metro for neck pain and breathing problems. (Tr. 840). Dr. Krofina noted Plaintiff was not taking her medication because "she [could] not afford" it. (Tr. 840).

On August 10, 2010, Plaintiff presented at Metro complaining of left rib pain, and due to being kicked in the ribs in June 2010, Plaintiff was coughing up "green color mucus". (Tr. 835). Plaintiff was instructed to comply with her breathing medications and follow-up. (Tr. 840).

On September 9, 2010, Plaintiff presented at Metro for pulmonary function testing. (Tr. 825). Plaintiff's FEV1 score was 1.38, which was 47 percent of the predicted normal value. (Tr. 828). Plaintiff was counseled on the "need to stop smoking and encouraged to attend classes". (Tr. 829).

13

On September 16, 2010, Plaintiff presented at Metro emergency room for breathing problems. (Tr. 775). Plaintiff reported she had been in prison for breaking and entering, was released a month ago, and was now homeless. (Tr. 800, 833). Plaintiff reported her respiratory problems were worse since being homeless. (Tr. 800). On September 21, 2010, Plaintiff presented for a pulmonary follow-up and it was noted Plaintiff's pneumonia-like symptoms started in July 2010 while she was incarcerated. (Tr. 805). It was noted Plaintiff smoked a pack and a half of cigarettes a day. (Tr. 806). Plaintiff was instructed to continue on her breathing medication. (Tr. 815).

On October 7, 2010, Plaintiff presented at Metro for COPD check-up. (Tr. 771). Plaintiff was diagnosed with a lung abscess and the flu. (Tr. 901). Plaintiff's complications arose while she was incarcerated, where she developed an infection. (Tr. 1159). Patient reported no significant cough and breathing medications were refilled. (Tr. 1162).

On November 19, 2010, Plaintiff presented at Metro for a routine pulmonary follow-up visit and reported coughing yellow sputum. (Tr. 1136). Plaintiff reported her breathing problems worsened when she stopped taking her breathing medication, which she stated she could not afford. (Tr. 1136). Plaintiff's friend purchased the breathing medication for her, and she had been taking it for a few days before her visit. (Tr. 1136). Plaintiff's pulmonary exam was normal and breathing medications were prescribed. (Tr. 1138).

On January 13, 2011, Plaintiff presented at Metro for a follow-up pulmonary visit and presented with numerous bodily injuries. (Tr. 1105). Plaintiff was tearful and reported her boyfriend injured her. (Tr. 1105). An x-ray of Plaintiff's lung showed resolution of the lung abscess diagnosed October 7, 2010. (Tr. 1107).

On February 23, 2011, Plaintiff presented at Metro for a follow-up pulmonary visit. (Tr.

14

1085).  Plaintiff had a lung abscess and the flu for 2 weeks. (Tr. 901). (Tr. 1085). Plaintiff reported

she was "doing [okay]" but recently developed a cough. (Tr. 1085). Plaintiff reported she moved to

a women's shelter the week before, which was confirmed by a letter from the director. (Tr. 260,

1085). Plaintiff reported she used oxygen some nights, but reported smoking five to seven cigarettes

per day despite "good adherence" to breathing medication. (Tr. 1085). Plaintiff's FEV1 measured

1.61, which was 56 percent of the predicted normal value. However, the study was sub-optimal due

to lack of plateau in the volume-time tracing. (Tr. 1086, 1092). It was noted Plaintiff suffered from

COPD with asthma features. (Tr. 1086).

On April 5, 2011, Tina Oney, BC, from Metro Psychiatric filled out a psychiatric

questionnaire on Plaintiff's behalf. (Tr. 1071, 1073). Ms. Oney noted numerous times Plaintiff was

not compliant in taking her prescribed medications, and on presentment is frequently angry and

aggressive. (Tr. 1071). Ms. Oney stated "[Plaintiff] will not be able to work until she is sober [and]

med[ication] compliant." (Tr. 1072).

*ALJ's Decision*

After a hearing, the ALJ denied Plaintiff's claim. (Tr. 6). The ALJ found Plaintiff suffered

from a disability, but substance use disorders, namely nicotine and alcohol abuse, were contributing

factors material to the determination, thus leading to a finding that Plaintiff is not disabled. (Tr. 10).

The ALJ explained when a claimant is under a disability, and there is medical evidence of a substance

use disorder, an ALJ must assess whether the substance use disorder is a contributing factor material

to the disability. (Tr. 9). If it is, the individual is not under a disability. (Tr. 9). 42 U.S.C.

§423(d)(2)(C). The ALJ found Plaintiff suffers from the following severe impairments:

COPD/asthma; arthritis; degenerative disc disease of the cervical and lumbar spines;

15

gastroesophageal reflux disease, bipolar disorder; borderline intellectual functioning; alcohol dependence; and nicotine abuse. (Tr. 12). However, the ALJ found if Plaintiff ceased substance use, she would not have an impairment or combination of impairments that meets or medically equals a listing. The ALJ noted Plaintiff's numerous pulmonary function tests, and explained why he rejected testing scores that met the listing, and accepted scores that did not. (Tr. 15). Specifically, the ALJ noted inconsistencies in Plaintiff's FEV1 scores, but noted for the scores that qualified Plaintiff under the listing, Plaintiff had been non-compliant in taking medication, continually smoked cigarettes, and abused alcohol. Additionally, the ALJ discounted results due to acute exacerbations, such as cut grass exposure and sub-optimal effort during testing. (Tr. 15-16). The ALJ provided detailed and sufficient reasoning for the rejection of some pulmonary function testing scores, and not others. (Tr. 15-16).

### Standard of Review

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*,

16

336 F.3d 469, 477 (6th Cir. 2003).

### Standard for Disability

Eligibility for SSI and DIB is predicated on the existence of a disability. 42 U.S.C. § 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process – found at 20 C.F.R. §§ 404.1520 and 416.920 – to determine if a claimant is disabled:

1.  Was claimant engaged in a substantial gainful activity?

2.  Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3.  Does the severe impairment meet one of the listed impairments?

4.  What is claimant's residual functional capacity and can claimant perform past relevant work?

5.  Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The court considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the

17

duration requirements, is she determined to be disabled. 20 C.F.R. §§ 404.1520(b)-(f) & 416.920(b)-

(f); *see also Walters*, 127 F.3d at 529.

## Discussion

Plaintiff raises two challenges to the ALJ's decision:

1.     Whether the Commissioner's decision is supported by substantial evidence where the ALJ failed to find the Plaintiff's impairment(s) met the requirements of listing 3.02(B); and

2.     Whether the ALJ erred as a matter of law by mis-applying the non-compliance regulation 20 C.F.R. §404.1530 in determining that Plaintiff did not meet listing 3.02(B).

(Doc. 13, at 1).  For the reasons described below, these challenges do not succeed.

### *3.02(A) v. 3.02(B) and Pulmonary Function Testing*

Listing impairment 3.02(B) covers *chronic restrictive ventilatory disease* (CRVD). However,

Plaintiff suffers from *chronic obstructive pulmonary disease* (COPD), which is evaluated under

listing 3.02(A). The difference in statutory reference, while slight clerically, is significant in terms

of lung function testing requirements and interpretation of Plaintiff's alleged disability. Plaintiff

asserted to the Commissioner that she suffered from COPD, and has incorrectly referenced 3.02(B)

for the first time in her appeal.

Pulmonary function tests (PFTs), in general, measure lung capacity by determining how much

air the lungs can hold, how quickly air moves in and out of the lungs, and how well the lungs move

oxygen into and remove carbon dioxide from the bloodstream. The Merck Manual, 19th ed., §14,

1851 (2011). Spirometry is the PFT used to measure severity of lung obstruction in patients with

COPD and CRVD.  Social Security Disability Tests, Vol. 1, §3.22 at 3-50 (2011). For this test, a

patient breathes into a mouthpiece attached to a recording device, or spirometer. The information

collected by the spirometer is printed out on a chart called a spirogam. Spirometry produces three

important measurements: the forced vital capacity (FVC); the forced expiratory volume in one second (FEV1); and the FEV1 divided by the FVC (FVC/FEV1), which is expressed as a percentage. *Id*. at 3-49. The FVC is the total volume of air that can be exhaled with maximum effort following maximum inspiration. *Id*. The FEV1 is the volume of air that can be exhaled with maximum effort during the first second, i.e. the volume exhaled during the first second of the FVC. *Id*.

Listing 3.02(B) requires the use of *FVC* values to determine whether a claimant with CRVD is disabled. 20 C.F.R. Pt. 404, Subpart P, App. 1, §3.02(B), Table II (emphasis added). To qualify under listing 3.02(B), claimants are required to meet a threshold FVC value according to their height. For instance, a claimant who is 64-65 inches tall is required to have a FVC equal to or less than 1.45 to meet listing impairment 3.02(B). *Id*. On the other hand, §3.02(A) requires the use of *FEV1* values to determine whether a claimant with COPD is disabled. *Id*. §3.02(A), Table I (emphasis added). To qualify under listing 3.02(A), claimants are required to meet a threshold FEV1 value according to their height. A claimant, like Plaintiff, who is 64-65 inches tall is required to have an FEV1 equal to or less than 1.25 to meet listing impairment 3.02(A). *Id*.

Plaintiff asserts she is disabled due to COPD, yet claims the ALJ erred by finding Plaintiff did not meet listing 3.02(B), which concerns CRVD. (Doc. 13, at 1, 9).  To further confuse matters, both Plaintiff and Defendant used the 3.02(B) listing threshold of 1.45, but applied FEV1 values from the medical records which would be evaluated under 3.02(A), which is, in a manner of speaking, evaluating apples with the orange grid. (*See* Doc. 13, at 9; Doc. 16, at 3-4).

There can be no dispute that the disease under consideration is COPD.  First, Plaintiff claims she is disabled because of COPD, and the record reflects she was continually diagnosed with it. (Tr. 271,  273, 285, 290, 314, 359, 443, 561, 571, 861, 869, 1086). Second, at the ALJ hearing, Plaintiff's counsel argued Plaintiff's FEV1 scores  qualified Plaintiff under listing 3.02(A), with no reference

19

to listing 3.02(B). (Tr. 15-16). Third, the ALJ analyzed Plaintiff's claim under 3.02(A) in his decision, properly using FEV1 values to interpret the severity of Plaintiff's COPD. (Tr. 34-35).

As indicated above, Plaintiff is required to have FEV1 values equal to or less than 1.25 to meet listing impairment 3.02(A). However, in addition to FEV1 values, courts and ALJs must consider testing administration procedures. For instance, three satisfactory forced maneuvers must be taken during each PFT, and the highest FEV1 value of the three testing maneuvers prevails as the determinant score. *Id*. §3.00E. In addition, a PFT should be repeated after administration of an aerosolized bronchodilator, if the pre-bronchodilator FEV1 value is less than 70 percent of the predicted normal value. *Id*. Moreover, lung function testing should "not be performed unless the clinical status is stable (e.g., the individual is not having an asthmatic attack or suffering from an acute respiratory infection or other chronic illness)." *Id*. Finally, review of the "longitudinal clinical record" including "a description of the treatment prescribed by the treating source" is required. *Id*.

Notably, all of Plaintiff's PFTs fail to meet the testing administration procedures. The tests fail to meet procedural requirements for a variety of reasons: testing was not repeated after administration of brochodilator when the predicted value was less that 70 percent; administrators failed to administer three forced expiratory maneuvers each session; and Plaintiff was tested during clinical instability. (Tr. 314, 325, 326, 340, 358, 498, 508, 524, 584, 828, 846, 868, 1086). However, the PFTs did provide the ALJ with a one time FEV1 value from each test. (Tr. 314, 325, 326, 340, 358, 498, 508, 524, 584, 828, 846, 868, 1086). Irrespective of testing, an individual can still meet a listing impairment based on the longitudinal medical record, as it provides information the ongoing medical severity of the impairment. *Id*. § 3.00(E). Thus, the ALJ still considered the FEV1 scores, and did so properly, despite Plaintiff's burden to provide the ALJ with properly administered measurements to show she met or equaled the listing.  *Bowen v. Yuckert*, 482 U.S. 137, 147 n. 5

20

(1987); *see also Becker v. Comm'r of Soc. Sec.*, 2009 WL 483833, at *6 (S.D. Ohio 2009).

***Substance Use Standard***

In 1996, Congress amended the Social Security Act to prohibit the award of benefits when alcoholism or drug addiction is a contributing factor material to an individual's disability determination. 42 U.S.C. §§ 423(d)(2)(C) and 1382c(a)(3)(J); *see also Mathews v. Astrue*, 2011 U.S. Dist. LEXIS 152839, at *19 (N.D. Ohio 2011). The key factor in determining whether drug addiction or alcoholism is a contributing factor material to the determination of disability is whether the individual would be disabled if he or she stopped using drugs or alcohol. 20 C.F.R. § 416.935(b)(1); *see Mathews*, 2011 U.S. Dist. LEXIS 152839 at *19.

In order to determine whether an individual is precluded from benefits, an ALJ must first determine if an individual is disabled, irrespective of substance use. *Id*. § 404.1535(a). Next, the ALJ must determine whether alcohol or drug abuse is a material contributor to the disability. *Id*. If the ALJ determines the remaining limitations would not be disabling without substance use, then drug addiction or alcoholism is a "contributing factor material to the determination of disability" and benefits shall not be awarded. *Id*. § 416.935(b)(2)(I).

## Analysis

***Listing Impairment 3.02(A)***

Plaintiff's PFTs reveal sporadic FEV1 scores, which at times meet listing impairment 3.02(A), and at times do not. Plaintiff contends she falls under listing impairment because some of her FEV1 scores meet the listing. (Doc. 13, at 9). Plaintiff also contends the ALJ should have obtained a "medical opinion regarding a meeting or equaling of this listing" due to the "voluminous [medical] records". (Doc. 13, at 10). The undersigned disagrees.  First, the ALJ properly analyzed Plaintiff's substance use, in conjunction with thoroughly detailed reasoning for rejection or acceptance of

21

Plaintiff's inconsistent FEV1 scores. Second, contrary to Plaintiff's assertion, the ALJ was not required to obtain a medical opinion to assess the "voluminous record". (Doc. 13, at 10).

***Listing 3.02(A) and Substance Use***

According to her height, Plaintiff needed FEV1 scores of 1.25 or lower to qualify under listing 3.02(A). 20 C.F.R. Part 404, Subpart P, Appendix 1, §3.02(A), Table 1. Plaintiff's FEV1 scores were as follows:

| | |
|---|---|
| April 9, 2007 | 1.09 |
| August 22, 2007 | 1.80 |
| July 30, 2008 | 1.37 |
| August 14, 2008 | 1.63 |
| March 20, 2009 | 1.60 |
| June 19, 2009 | .98 |
| July 13, 2009 | 1.74 |
| November 9, 2009 | 1.12 |
| June 4, 2010 | 1.23 |
| July 13, 2010 | 1.63 |
| September 9, 2010 | 1.38 |
| February 23, 2011 | 1.61 |

Out of twelve PFT's, only four qualified Plaintiff under listing impairment 3.02(A). Defendant asserts, based on the majority of scores disqualifying Plaintiff from the listing, Plaintiff failed to satisfy all the requirements to meet the listing. (Doc. 16, at 4). "In order to be found disabled based on a listed impairment, the claimant must exhibit all the elements of the listing." (Doc. 16, at 4); *Elam ex rel. Golay v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003). While this general assertion is correct, the Court still must analyze whether the ALJ properly considered the FEV1

22

scores in his determination. *Holland v. Comm'r of Soc. Sec.*, 152 F. Supp.2d 929, 933 (W.D. Tenn. 2001) (the ALJ must explain why conflicting evidence is not credited and make specific findings to support his conclusion when COPD testing results are inconsistent); *see Joshua v. Comm'r of Soc. Sec.*, 2009 WL 1107681 (S.D. Mich. 2009) (remanding when ALJ failed to cite, mention or discuss PFT results, stating "some articulation of the rationale for the conclusion and its evidentiary foundation is required."). While the ALJ is required to review the claimant's symptoms and make specific findings essential to the conclusion, it is unnecessary for  an ALJ to state why a claimant failed to satisfy every element of a listing. *Becker v. Comm'r of Soc. Sec.*, 2009 WL 483833, at *6 (S.D. Ohio 2009). The law also does not require the ALJ to discuss each FEV1 score in detail. *Walker v. Sec'y Health and Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989) (an ALJ is not required to discuss every piece of medical evidence).

The ALJ properly discussed Plaintiff's FEV1 scores, and explained his findings with factual evidence from the record. (Tr. 15-16). For Plaintiff's FEV1 score measuring  .98., the ALJ noted Plaintiff did not reach the 6 second plateau and gave sub-optimal effort. (Tr. 15). The ALJ also noted Plaintiff continued to smoke and Plaintiff's condition was triggered by cut grass exposure when the PFT was administered. (Tr. 15). *See* 20 C.F.R., Part 404, Subpart P, Appendix 1, §3.00E (lung function testing should not be performed unless the patient's clinical status is stable). The ALJ discussed Plaintiff's FEV1 score of 1.12 from November 2009, and noted Plaintiff was smoking, drinking, and not taking breathing medication when the PFT was administred. (Tr. 15). The ALJ acknowledged the remaining disqualifying scores, and rejected them due to Plaintiff's consistent medication non-compliance, substance use, and habitual smoking.

As the ALJ pointed out, eight of Plaintiff's FEV1 scores significantly exceed the threshold specified in listing 3.02(A), greatly undermining Plaintiff's argument. The ALJ remarked on

23

Plaintiff's FEV1 score of 1.63 taken July 12, 2010, and noted at the time of the test Plaintiff was complying with medication and had severely cut back on drinking and smoking. (Tr. 16). The ALJ even noted the faulty administration of some listing scores above the threshold, but held Plaintiff's substance use and non-compliance, along with certain triggers, still undermined Plaintiff's ability to meet the listing. (Tr. 16).

Plaintiff asks this Court to look at raw FEV1 listing scores, but never takes into account substance use, as the ALJ did, when assessing Plaintiff's claim. (*See* Doc. 13, at 9; Tr. 9-22). The ALJ not only considered the highest FEV1 values, but explained his rejection of Plaintiff's lowest FEV1 values on account of Plaintiff's non-compliance and substance use. (Tr. 16); *see also* 20 C.F.R., Part 404, Subpart P, Appendix 1, §3.00E. The record is replete with instances of Plaintiff's severe substance use directly causing a negative effect on Plaintiff's health. (Tr. 269, 270, 271, 275, 277, 290, 296, 316, 329, 359, 342, 384, 386, 510, 515, 522, 560, 596, 580, 618, 685, 701, 714, 849, 852, 866, 870, 872, 952, 972-73, 982, 988, 1031, 1136, 1085).  On numerous occasions, Plaintiff presented at Metro intoxicated and complained of shortness of breath, but reported heavy smoking. (Tr. 273, 285, 386, 480, 515, 522, 560, 596, 1002, 1026). Notably, Plaintiff's second highest FEV1 score was taken during a period of sobriety, smoking cessation, and medication compliance. (Tr. 498). Moreover, Plaintiff stated she felt "great" and "much better" when she refrained from smoking and drinking. (Tr. 453). However, each time Plaintiff began drinking and smoking again her breathing condition deteriorated; and she would return to the daunting cycle of presenting at Metro for breathing problems, associated with intoxication, medication non-compliance, and heavy smoking. (Tr. 597, 1059).

The ALJ outlined the correct standard of review for a claimant with alcoholism, and against that backdrop, analyzed Plaintiff's claim. (Tr. 9, 12-14). The ALJ found that Plaintiff had severe

impairments; however, after considering Plaintiff's substance use, the ALJ found Plaintiff did not

meet or equal  listing impairment 3.02(A). Substantial evidence supports the ALJ's conclusion.

### Medical Opinion Testimony

Plaintiff makes a brief assertion, without citing any legal authority, that the ALJ "should have

obtained medical opinion regarding a meeting or equaling of this listing". (Doc. 13, at 10). The

undersigned disagrees.

An ALJ "may . . . ask for and consider" opinions from medical experts regarding "(1) the

nature and severity of a claimant's impairments and . . . (2) whether the impairments medically equal

any listed impairment." *Lyke v. Comm'r of Soc. Sec.*, 2011 WL 2601429 at *5 (M.D. Tenn. 2011);

20 C.F.R. § 404.1527 (f)(2)(iii). Accordingly, the Sixth Circuit gives an ALJ considerable discretion

in deciding whether or not to call a medical expert for listing impairment evaluation. *Davis v.*

*Cheater*, 104 F.3d 361, 1996 WL 732298, at *2 (6th Cir. 1986); *see also Lyke*, 2011 WL 2601429

at *5 (M.D. Tenn. 2011). As the Defendant points out, the ALJ reasonably determined the record was

adequate to make a step-three determination and Plaintiff "made no showing that anything of

significance [was] missing from the current record." *Branum v. Barnhart*, 385 F.3d 1268, 1271 (10th

Cir. 2004). While the ALJ was not required to call a medical expert, he certainly met the requisite

review of claimant's symptoms and made specific findings essential to his conclusion. *Becker*, 2009

WL 483833 at *6.

### Non-Compliance

Plaintiff also alleges the ALJ erred as a matter of law by mis-applying non-compliance

regulation 20 C.F.R. § 404.1530 in determining Plaintiff did not meet listing impairment 3.02(A).

First, Plaintiff asserts "there is no evidence in the record to demonstrate that, if the [Plaintiff] quit

smoking, her condition would improve." (Doc. 13, at 10). The undersigned disagrees, and notes

Plaintiff was counseled by her physicians on numerous occasions to quit smoking because doing so would improve her breathing condition. (Tr. 269, 314, 342, 386, 443, 618, 701, 1033). Second, Plaintiff asserts her medication non-compliance is due to "financial and logistical barriers." (Doc. 13, at 11).

An impairment remedied by treatment cannot serve as a basis for a finding of disability. *Harris v. Heckler*, 756 F.2d 431, 436 (6th Cir. 1985). The regulations mandate, in relevant part, when a claimant does "not follow prescribed treatment . . . . without good reason" he will not be found disabled. 20 C.F.R. § 404.1530. Good reason includes refusal based on religious beliefs, refusal of repeated surgery to accommodate the same medical issue, and refusal of treatment based on magnitude of risk. *Id*. While smoking *per se* will not disqualify a Plaintiff from receiving medical benefits, the regulations certainly permit an ALJ to consider a claimant's failure to adhere to medical advice, including continuing to smoke despite repeated medical instructions to quit. *Becker v. Astrue*, 2012 U.S. Dist. LEXIS 89974, *44 (S.D. Ohio 2012).

Plaintiff alleges "there is no evidence in the record to demonstrate that, if [she] quit smoking, her condition would improve." (Doc. 9, at 10). Plaintiff is incorrect. First, the Sixth Circuit took judicial notice of a large body of medical opinions correlating smoking to health problems. *Sias v. Sec'y of Health & Human Servs.*, 861 F.2d 475, 480 (6th Cir. 1988). Second, the record is clear there is a correlation between smoking cessation and improvement to Plaintiff's respiratory health. Plaintiff's second highest FEV1 score was taken when Plaintiff had recently quit drinking and smoking. (Tr. 498). Moreover, Plaintiff, by her own admission, stated she felt "great" and "much better" when she refrained from smoking and drinking. (Tr. 453). However, not even a month after Plaintiff resumed smoking, her breathing condition deteriorated, and Plaintiff returned to presenting at Metro for breathing problems. (Tr. 597, 1059). Moreover, Plaintiff was counseled by her

26

physicians on numerous occasions to quit smoking because doing so would improve her breathing condition. (Tr. 269, 314, 342, 386, 443, 618, 701, 1033). Nevertheless, Plaintiff continued to smoke.

Plaintiff asserts her medication non-compliance is due to financial barriers, which could be good cause. The record reflects Plaintiff's alleged inability to pay for medication only four times, however, despite presentment for breathing related care approximately fifty times between 2007 and 2011. (Tr. 840, 849, 869, 944). Moreover, Plaintiff was questioned about her various medications at length by the ALJ. (Tr. 42-52). Notably, neither Plaintiff  nor Plaintiff's counsel asserted she could not afford her medication at the hearing. (Tr. 42-52). The Sixth Circuit in *Sias* took judicial notice of the monetary cost of smoking, and the undersigned does the same. *Sias*, 861 F.2d at 480. Furthermore, while Plaintiff battles a daily alcohol habit, she is nonetheless able to afford it. Plaintiff did not provide good reason for non-compliance, and she continually manages to afford substances that place her in the very condition she asserts disables her.

Finally, Plaintiff misconstrues the ALJ's analysis of Plaintiff's non-compliance. Plaintiff's argument assumes the ALJ's decision was based on non-compliance alone. However, the ALJ considered Plaintiff's non-compliance in conjunction with substance use  to find Plaintiff did not meet listing requirement 3.02(A). Notably, Plaintiff never addressed her substance use, or the effect it had on her claim.

The Social Security Act did not repeal the principle of individual responsibility. *Sias*, 861 F.2d at 480. And while the Court genuinely sympathizes with Plaintiff, it cannot reach beyond the law and award disability,  especially when Plaintiff has the obvious ability to remedy the very impairments from which she suffers. As the Sixth Circuit surmised in *Sias*:

> Each of us faces myriads of choices in life, and the choices we make, whether we like it or not, have consequences. If the claimant . . . chooses to drive [her]self to an early grave, that is [her] privilege--but if [s]he is not truly disabled, [s]he has no right

27

to require those who pay social security taxes to help underwrite the cost of [her] ride.

*Sias*, 861 F.2d at 480.

## Conclusion and Recommendation

Following review of the arguments presented, the record, and the applicable law, the Court finds the Commissioner's decision denying SSI and DIB benefits supported by substantial evidence. The undersigned therefore recommends the Commissioner's decision be affirmed.

        s/James R. Knepp II
        United States Magistrate Judge

ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this notice. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).